# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2018AP1952-CR |

| | |
|---|---|
| COMPLETE TITLE: | State of Wisconsin,<br>   Plaintiff-Respondent-Petitioner,<br>  v.<br>Mark D. Jensen,<br>   Defendant-Appellant. |

REVIEW OF DECISION OF THE COURT OF APPEALS

| | |
|---|---|
| OPINION FILED: | March 18, 2021 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | November 17, 2020 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|  COURT: | Circuit |
|  COUNTY: | Kenosha |
|  JUDGE: | Chad G. Kerkman |

JUSTICES:

DALLET, J., delivered the majority opinion of the Court, in which ROGGENSACK, C.J., ANN WALSH BRADLEY, REBECCA GRASSL BRADLEY, and HAGEDORN, JJ., joined, and in which ZIEGLER and KAROFSKY, JJ., joined except for ¶35. KAROFSKY, J., filed a concurring opinion, in which ZIEGLER, J., joined.

NOT PARTICIPATING:

ATTORNEYS:

For the plaintiff-respondent-petitioner, there were briefs filed by *Aaron R. O'Neil,* assistant attorney general; with whom on the briefs was *Joshua L. Kaul*, attorney general. There was an oral argument by *Aaron O'Neil.*

For the defendant-appellant, there was a brief filed by *Lauren J. Breckenfelder* and *Dustin C. Haskell,* assistant state public defenders. There was an oral argument by *Lauren Jane Breckenfelder.*

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2018AP1952-CR
(L.C. No. 2002CF314)

STATE OF WISCONSIN      :      IN SUPREME COURT

State of Wisconsin,

    Plaintiff-Respondent-Petitioner,

  v.

Mark D. Jensen,

    Defendant-Appellant.

**FILED**

**MAR 18, 2021**

Sheila T. Reiff
Clerk of Supreme Court

DALLET, J., delivered the majority opinion of the Court, in which ROGGENSACK, C.J., ANN WALSH BRADLEY, REBECCA GRASSL BRADLEY, and HAGEDORN, JJ., joined, and in which ZIEGLER and KAROFSKY, JJ., joined except for ¶35. KAROFSKY, J., filed a concurring opinion, in which ZIEGLER, J., joined.

REVIEW of a decision of the Court of Appeals. *Modified and, as modified, affirmed.*

¶1 REBECCA FRANK DALLET, J. Fourteen years ago, Mark Jensen was on trial for killing his wife, Julie.[1] Before the start of that trial, we held that certain hearsay statements made by Julie were testimonial. State v. Jensen (Jensen I), 2007 WI 26, ¶2, 299 Wis. 2d 267, 727 N.W.2d 518.

---

[1] To avoid confusion——and to remain consistent with previous decisions in this case——we refer to Mark Jensen as "Jensen" and Julie Jensen as "Julie."

For that reason, and because Jensen had no opportunity to cross-examine Julie about those statements, the statements were inadmissible under the Confrontation Clause.[2] We are now asked to determine whether the law on testimonial hearsay has since changed to such a degree that, at Jensen's new trial,[3] the circuit court was no longer bound by Jensen I. We hold that it has not. We therefore affirm the court of appeals' decision.[4]

I

¶2 Julie died from poisoning in 1998. Prior to her death, she made several statements suggesting that, if she died, the police should investigate Jensen. She wrote a letter and gave it to her neighbor with instructions to give the letter to the police should anything happen to her. She also left two voicemails with Pleasant Prairie Police Officer Ron Kosman two weeks before she died stating that if she were found dead, Jensen should be Kosman's "first suspect." In 2002, Jensen was charged with first-degree intentional homicide. Over the next several years, the circuit court held a series of pretrial hearings addressing the admissibility of Julie's letter and voicemails.

---

[2] U.S. Const. amend. VI, cl. 4 ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . .").

[3] The Honorable Chad G. Kerkman of the Kenosha County Circuit Court presiding.

[4] State v. Jensen, No. 2018AP1952-CR, unpublished slip op. (Wis. Ct. App. Feb. 26, 2020).

¶3 The circuit court initially ruled that Julie's letter was admissible but her voicemails were not. After that ruling, however, the United States Supreme Court decided Crawford v. Washington, 541 U.S. 36 (2004), which established that an unavailable witness's hearsay statement is inadmissible under the Confrontation Clause if the statement is testimonial and the defendant had no prior opportunity to cross-examine the witness. Id. at 50-54. In light of that decision, Jensen asked the circuit court to reconsider its previous ruling. Upon reconsideration, the circuit court determined that, under Crawford, Julie's letter and voicemails ("Julie's statements") were testimonial hearsay and were inadmissible because Jensen had no opportunity to cross-examine Julie.

¶4 The State appealed and we affirmed, applying Crawford and the United States Supreme Court's subsequent decision, Davis v. Washington, 547 U.S. 813 (2006).[5] Jensen I, 299 Wis. 2d 267. Davis set out what has come to be known as the "primary purpose test": a statement is testimonial if its primary purpose is "to establish or prove past events potentially relevant to later criminal proceedings." 547 U.S. at 822. The Court explained that although statements made in response to police questioning are generally testimonial, such statements are nontestimonial if their primary purpose is to help the police "meet an ongoing emergency." Id. at 822. Applying that test, we determined in

---

[5] Unless otherwise noted, all references to Davis v. Washington, 547 U.S. 813 (2006), are also references to Hammon v. Indiana, which the Court consolidated with Davis.

3

Jensen I that the primary purpose of Julie's statements was not to help the police resolve an active emergency but to "investigate or aid in prosecution in the event of her death." Jensen I, 299 Wis. 2d 267, ¶¶27, 30. Thus, under Crawford and Davis's interpretation of the Confrontation Clause, Julie's statements were inadmissible. Id., ¶34.

¶5 We remanded the cause to the circuit court to determine whether Julie's statements were nevertheless admissible under the forfeiture-by-wrongdoing doctrine, which we adopted in Jensen I. See id., ¶¶2, 52. At the time, that doctrine stated that a defendant forfeits his constitutional right to confront a witness when the defendant caused that witness's unavailability. See id., ¶57. On remand, the circuit court found that the State had shown by a preponderance of the evidence that Jensen caused Julie's unavailability. Therefore, the Confrontation Clause notwithstanding, Julie's statements were admissible after all. Relying at least in part on those statements, a jury convicted Jensen of Julie's murder.

¶6 Jensen again appealed. State v. Jensen (Jensen II), 2011 WI App 3, 331 Wis. 2d 440, 794 N.W.2d 482. While that appeal was pending, the United States Supreme Court decided another case directly affecting Jensen, Giles v. California, 554 U.S. 353 (2008). There, the Court refined the forfeiture-by-wrongdoing doctrine, holding that it applies only when the defendant caused the witness's unavailability with the specific intent of preventing the witness from testifying. See id. at 361-68. In Jensen II, the court of appeals "assum[ed]"

4

that Jensen had not killed Julie specifically to keep her from testifying at trial; therefore, under Giles, Jensen had not forfeited his Confrontation Clause rights and the circuit court had erred in admitting Julie's statements.  But the court of appeals also held that the circuit court's error was harmless, given the "voluminous" other evidence supporting the jury's guilty verdict.  See Jensen II, 331 Wis. 2d 440, ¶35.

¶7    That harmless error conclusion formed the basis for Jensen's federal habeas corpus litigation.[6]  There, the federal courts agreed with Jensen that it was not harmless error to admit Julie's testimonial statements in violation of the Confrontation Clause.  Jensen v. Schwochert, No. 11-C-0803, 2013 WL 6708767 (E.D. Wis. Dec. 18, 2013), aff'd, Jensen v. Clements, 800 F.3d 892, 908 (7th Cir. 2015) (holding that was it was "beyond any possibility for fairminded disagreement" that admitting Julie's statements "had a substantial and injurious effect" on the jury's verdict (quoted source omitted)).  Concluding that the Wisconsin court of appeals' decision in Jensen II was an "unreasonable application of clearly established federal law," the federal court ordered Jensen's conviction vacated.  Schwochert, 2013 WL 6708767, at *16-17.  The State immediately initiated new proceedings against Jensen.

---

[6] We denied Jensen's petition for review regarding Jensen II.  See Jensen v. Schwochert, No. 11-C-0803, 2013 WL 6708767, at *5 (E.D. Wis. Dec. 18, 2013), aff'd, Jensen v. Clements, 800 F.3d 892 (7th Cir. 2015).

5

¶8 In this new pretrial period, Jensen filed a motion to exclude Julie's statements, per our holding in Jensen I. The State urged the circuit court to address anew whether Julie's statements were admissible, arguing that the United States Supreme Court had since "narrowed" the definition of "testimonial" to such a degree that the circuit court was not bound by Jensen I. The circuit court agreed. It explained that "a lot has happened" since Jensen I and that "based upon the law that we have today," Julie's statements were not testimonial. The circuit court reached that conclusion by "applying the factors in Ohio v. Clark, the more recent cases including Michigan v. Bryant, and other cases that came out since Crawford v. Washington and Jensen I."[7] The State then moved the circuit court to forgo a new trial and reinstate Jensen's original conviction and life sentence on the grounds that, if Julie's statements were again admissible, the evidence now was identical to that in Jensen's first trial. The circuit court granted the State's motion. Jensen appealed.

¶9 The court of appeals reversed, holding that neither it nor the circuit court was "at liberty to decide" that Julie's statements were nontestimonial, given our holding in Jensen I. State v. Jensen (Jensen III), No. 2018AP1952-CR, unpublished slip op., at 12 (Wis. Ct. App. Feb. 26, 2020). The court of

---

[7] The circuit court noted, incorrectly, that Davis (and Hammon) was decided after Jensen I. Not only was Davis decided before Jensen I but in Jensen I we expressly followed Davis. See State v. Jensen (Jensen I), 2007 WI 26, ¶19, 299 Wis. 2d 267, 727 N.W.2d 518.

6

appeals explained that under Cook v. Cook, 208 Wis. 2d 166, 560 N.W.2d 246 (1997), this court is the only one with the power to modify or overrule one of our previous decisions. The court of appeals concluded that, because we have never modified or overruled Jensen I, the circuit court erred in finding Julie's statements admissible and, in turn, failing to hold a new trial. It then remanded the cause "for a new trial at which Julie's letter and [voicemails] may not be admitted into evidence." Id. Having decided Jensen's appeal under Cook, the court of appeals declined to address Jensen's other challenges, including claims that the circuit court judge was biased against him and that the circuit court violated the federal court's habeas order by reinstating his conviction without a trial.

¶10 We granted the State's petition for review of the following three issues: (1) whether the court of appeals erred in reviewing the circuit court's decision under Cook instead of the law of the case; (2) if so, whether the circuit court permissibly deviated from the law of the case and correctly determined that Julie's statements are nontestimonial hearsay; and (3) whether we should remand the cause to the court of appeals to decide Jensen's remaining challenges.

¶11 Although we agree with the court of appeals' ultimate conclusion that the circuit court is bound by Jensen I, we hold that the court of the appeals erred in relying on Cook to reach that decision. In Cook, we held that the court of appeals has no power to overrule, modify, or withdraw language from one of its own published decisions; only this court has that power.

7

See Cook, 208 Wis. 2d at 189. The issue here, however, is about the law of the case, to which Cook does not apply. Accordingly, we modify the court of appeals' decision to the extent it relies on Cook. Our analysis proceeds under the doctrine of the law of the case.

II

¶12 Whether a decision establishes the law of the case is a question of law that we review de novo. State v. Stuart (Stuart I), 2003 WI 73, ¶20, 262 Wis. 2d 620, 664 N.W.2d 82. Although lower courts have the discretion to depart from the law of the case when a "controlling authority has since made a contrary decision of the law," State v. Brady, 130 Wis. 2d 443, 448, 388 N.W.2d 151 (1986), whether such a contrary decision has been made is a question of law that we review de novo. See Kocken v. Wis. Council, 2007 WI 72, ¶¶25-26, 301 Wis. 2d 266, 732 N.W.2d 828.

¶13 The law of the case is a "longstanding rule" that requires courts to adhere to an appellate court's ruling on a legal issue "in all subsequent proceedings in the trial court or on later appeal." Stuart I, 262 Wis. 2d 620, ¶23 (quoting Univest Corp. v. Gen. Split Corp., 148 Wis. 2d 29, 38, 435 N.W.2d 234 (1989)). The rule ensures stability for litigants and reinforces the finality of a court's decisions. See Univest Corp., 148 Wis. 2d at 37-38. Courts in subsequent proceedings should therefore "be loathe" to revisit an appellate court's decision absent "extraordinary circumstances." Christianson v. Colt Indus. Oper. Corp., 486 U.S. 800, 817 (1988). That

8

admonition aside, absolute adherence to the law of the case is not required. As is relevant here, lower courts may depart from the initial decision if "a controlling authority has since made a contrary decision of the law" on the same issue.[8] Stuart I, 262 Wis. 2d 620, ¶24 (quoting Brady, 130 Wis. 2d at 448).

¶14 Our analysis thus proceeds in two parts. First, we determine which case established the law of the case that Julie's statements are testimonial hearsay. Second, we analyze whether a controlling court has since issued a contrary decision on the same point of law.

A

¶15 The parties largely agree that Jensen I established the law of the case. Jensen also argues that either federal habeas case, Schwochert or Clements, could establish the law of the case because both concluded that admitting Julie's statements violated the Confrontation Clause. But a federal habeas proceeding cannot establish the law of the case because it "is not a subsequent stage of the underlying criminal proceedings; it is a separate civil case." E.g., Edmonds v. Smith, 922 F.3d 737, 739 (6th Cir. 2019). Therefore, Jensen I

---

[8] Courts may also depart from the law of the case in two other situations: when the evidence at a subsequent trial is "substantially different" than that at the initial trial; and when following the law of the case would result in a "manifest injustice." See State v. Stuart, 2003 WI 73, 262 Wis. 2d 620, 664 N.W.2d 82. Neither of those situations applies here.

is the only decision establishing the law of the case that Julie's hearsay statements are testimonial.[9]

B

¶16 We next analyze whether the current law regarding the admissibility of testimonial hearsay is contrary to that relied upon in Jensen I. We decided Jensen I under both Crawford and Davis. Therefore, we must determine whether the United States Supreme Court has since contradicted Crawford or Davis. See State v. Stuart (Stuart II), 2005 WI 47, ¶3 n.2, 279 Wis. 2d 659, 695 N.W.2d 259. As Jensen's Confrontation Clause issue arises under the federal Constitution, we are bound by the United States Supreme Court's jurisprudence interpreting that clause. See, e.g., State v. Delebreau, 2015 WI 55, ¶43, 362 Wis. 2d 542, 864 N.W.2d 852.

¶17 Since Jensen I, the United States Supreme Court has decided two cases that address the definition of testimonial hearsay: Michigan v. Bryant, 562 U.S. 344 (2011), and Ohio v. Clark, 576 U.S. 237 (2015). The State argues that Bryant and Clark narrowed the definition of "testimonial" so extensively that Jensen I no longer applies, thereby allowing the circuit

---

[9] Even if Schwochert or Clements could establish the law of the case, our conclusion would be the same because both agreed with our holding in Jensen I that Julie's statements are testimonial hearsay. See Schwochert, 2013 WL 6708767, at *17 ("Jensen's rights under the Confrontation Clause of the Sixth Amendment were violated when the trial court admitted" Julie's statements); Clements, 800 F.3d at 908 (adding that "there is no doubt that" admitting Julie's statements violated "Jensen's rights under the Confrontation Clause").

10

court to re-evaluate Julie's statements and conclude that they are admissible nontestimonial statements. Jensen counters that neither Bryant nor Clark altered the Confrontation Clause analysis set forth in Crawford and Davis in any way that undermines our reasoning in Jensen I.

¶18 We agree with Jensen. At the time we decided Jensen I, the Confrontation Clause barred the admission at trial of an unavailable witness's hearsay statement that the defendant had no prior meaningful opportunity to cross-examine and that was made for the primary purpose of creating prosecutorial evidence. Bryant and Clark represent developments in applying the primary purpose test, but neither is contrary to it.

1

¶19 Prior to Crawford, an unavailable witness's hearsay statement was admissible under the Confrontation Clause if it met a certain "reliability" threshold. See Ohio v. Roberts, 448 U.S. 56, 66 (1980). A statement met that threshold if it fell within a "firmly rooted hearsay exception" or if it bore some other "indicia of reliability." Id. The United States Supreme Court had read traditional hearsay rules and the Confrontation Clause as somewhat redundant, reasoning that "certain hearsay exceptions rest upon such solid foundations that admission of virtually any evidence within them comports with" the Confrontation Clause. See id.

¶20 Crawford "fundamentally change[d]" that analysis. Jensen I, 299 Wis. 2d 267, ¶14. Crawford first focused the scope of the Confrontation Clause analysis on the circumstances

in which one makes a statement, explaining that the Constitution is "acute[ly]"——but not exclusively——concerned with "formal statement[s] to government officers" rather than "casual remark[s] to an acquaintance." Crawford, 541 U.S. at 51. The Court then turned to the statement itself, holding that the Confrontation Clause's application to an unavailable witness's hearsay statement turns on two key factors: the statement's purpose and whether the statement had been "tested" on cross-examination. Id. at 50-56.[10]

¶21 On the former, Crawford held that the Confrontation Clause applied only to statements that are "testimonial," which it defined as a statement "made for the purpose of establishing or proving some fact." Id. at 51 (quoted source omitted). The Court declined, however, to "spell out a comprehensive definition of 'testimonial.'" Id. at 68; see also Davis, 547 U.S. at 822 (declining to "produce an exhaustive classification of all conceivable statements"). Rather, it identified three broad "formulations" of testimonial statements: (1) "ex parte in-court testimony," such as "prior testimony that the defendant was unable to cross-examine"; (2) out-of-court statements "contained in formalized testimonial materials," such as an

---

[10] Before Crawford, cross-examination was but one method of proving that a testimonial hearsay statement was acceptably reliable. See Ohio v. Roberts, 448 U.S. 56, 70-73 (1980); Mancusi v. Stubbs, 408 U.S. 204, 216 (1972). But Crawford went further, holding that a prior opportunity for meaningful cross-examination was the only way to show that a testimonial hearsay statement was sufficiently reliable under the Confrontation Clause. Crawford v. Washington, 541 U.S. 36, 55-56 (2004).

12

affidavit or a deposition; and (3) "statements that were made under circumstances [that] would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Crawford, 541 U.S. at 51-52 (quoted sources omitted). Putting these factors together, but again declining to limit its holding to the specific facts in Crawford, the Court held that, "at a minimum," the definition of "testimonial" includes prior testimony and a statement made during police interrogation. Id. at 68.

¶22 In Davis and its companion case, Hammon, however, the Court explained that not all statements to police are testimonial. There, the Court analyzed statements made to police during their response to two domestic violence incidents. It applied Crawford to both situations, but factual differences between the two cases led the Court to divergent conclusions. In Davis, the victim told the 911 operator that Davis was "jumpin' on [her] again" and beating her with his fists. She "described the context of the assault" and gave the 911 operator other identifying information about Davis. Davis, 547 U.S. at 817-18. In Hammon, the police had responded to a report of domestic violence, finding the victim on the front porch and Hammon inside the house. The victim allowed the police to go inside, where they first questioned Hammon and then her. At the end of that questioning, the victim "fill[ed] out and sign[ed] a battery affidavit" in which she explained that Hammon broke a glass heater, pushed her into the broken glass, hit her in the

13

chest, damaged her van so that she could not leave, and attacked her daughter. Id. at 819-21.

¶23 The Court held that the victim's statements in Davis were not testimonial because their primary purpose was to "enable police assistance with an ongoing emergency." Id. at 828. The Court differentiated these "frantic" statements, made "as they were actually happening" and while the victim was "in immediate danger," from those in Crawford, which were made "hours after the events . . . described had occurred." Id. at 827, 831 (emphasis removed). The statements also helped the police "assess the situation, the threat to their own safety, and possible danger to the potential victim." Id. at 832 (quoting Hiibel v. Sixth Jud. Dist. Ct., 542 U.S. 177, 186 (2004)). Thus, the victim "simply was not . . . testifying" because "[n]o 'witness' goes into court to proclaim an emergency." Id. at 828.

¶24 The Court reached the opposite conclusion in Hammon. There, it held that the victim's statements were testimonial because their primary purpose was to provide a "narrative of past events." Id. at 832. Even though Hammon was present while the police took the victim's statements, there "was no emergency in progress." Id. at 829. Her statements did not describe what was happening at that very moment, as in Davis, but rather what happened before the police arrived. Id. at 830.

¶25 We decided Jensen I by analyzing Julie's statements under the primary purpose test as explained in Davis. See Jensen I, 299 Wis. 2d 267, ¶¶18-19. We must therefore examine

14

the United States Supreme Court's more recent decisions in Bryant and Clark to determine if either decision is contrary to that test, thereby justifying the circuit court's departure from Jensen I.

2

¶26 The Court's main task in Bryant was to clarify what it means, outside of Davis's specific factual context, for a statement to have the primary purpose of "enabl[ing] police assistance to meet an ongoing emergency." See Bryant, 562 U.S. at 359 (quoting Davis, 547 U.S. at 822). Indeed, the Court noted that it "confront[ed] for the first time circumstances in which the 'ongoing emergency' discussed in Davis extends beyond an initial victim to a potential threat to the responding police and the public at large." Id. In Bryant, the police found the victim, Covington, at a gas station bleeding badly from a gunshot wound and having trouble speaking. They asked Covington who shot him and where the shooting occurred. Covington told the police that Bryant shot him through the back door of Bryant's house. Covington was then taken to a hospital, where he died a few hours later. Id. at 349-50. The Michigan Supreme Court held that Covington's statements were inadmissible testimonial hearsay similar to those in Hammon because he made them after the shooting occurred and the police did not "perceive[] an ongoing emergency at the gas station." Id. at 351.

¶27 The United States Supreme Court reversed. It held that the primary purpose of Covington's statements was to help

15

the police resolve an ongoing emergency, because when the police arrived on the scene, they did not know whether the person who shot Covington posed an ongoing threat to the public. Id. at 371-72. Covington's behavior——profusely bleeding from the stomach, repeatedly asking when an ambulance would arrive, having difficulty breathing——objectively revealed that he was answering the officers' questions only to give them information about what might be an active-shooter scenario. Id. at 373-74. Other evidence supporting that conclusion included the fact that, like the 911 call in Davis, Covington's statements were "harried" and made during a "fluid and somewhat confused" situation. Id. at 377. Because the primary purpose of the statements was to help the police resolve an ongoing emergency, they were not testimonial.

¶28 In reaching that conclusion, Bryant emphasized that the test for determining a statement's primary purpose is an objective one. Id. at 360. When deciding whether a statement is made to assist the police in resolving an ongoing emergency, courts must consider the overall circumstances in which the statement is made, such as whether the statement is made near the scene of the crime or later at the police station. Id. at 360-61. Ultimately, the crux of the inquiry is whether the statement is made to "end[] a threatening situation" (not testimonial) or to "prove[] past events potentially relevant to later criminal prosecution" (testimonial). Id. at 361 (quoting Davis, 547 U.S. at 822, 832). On that point, the Court

16

cautioned against construing _Davis_'s "ongoing emergency" definition too narrowly:

> Domestic violence cases like _Davis_ and _Hammon_ often have a narrower zone of potential victims than cases involving threats to public safety. An assessment of whether an emergency that threatens the police and public is ongoing cannot narrowly focus on whether the threat solely to the first victim has been neutralized because the threat to the first responders and public may continue.

_Id._ at 363-64.

¶29 _Bryant_ also reminded courts that whether an ongoing emergency exists is only one factor for determining a statement's primary purpose. _Id._ at 366. Other factors are also relevant, such as the statements and actions of both the declarant and the interrogators and formality of the encounter. _Id._ at 366-67. But just as formal police interrogations do not always produce testimonial statements, informal questioning "does not necessarily indicate . . . the lack of testimonial intent." _Id._ at 366; _see also Davis_, 547 U.S. at 822 & n.1. Courts must objectively analyze the declarant's and the interrogator's "actions and statements." _Bryant_, 562 U.S. at 367-68. The Court noted that this approach was the one it "suggested in _Davis_" when it first articulated that statements made to resolve an ongoing emergency are not testimonial. _Id._ at 370.

3

¶30 Whereas _Bryant_'s contextual analysis focused on the person making the statement, _Clark_ focused on the person to whom

17

the statement was made. In Clark, the Court was asked to resolve "whether statements to persons other than law enforcement officers are subject to the Confrontation Clause." 576 U.S. at 246. There, Clark had been convicted of assaulting his girlfriend's three-year-old child due, in part, to statements the child made to his teachers identifying Clark as his abuser. The child made those statements in response to his teachers' inquiries about visible injuries on his body. Concerned that the child was being abused, the teachers asked him questions "primarily aimed at identifying and ending the threat" of potentially letting him go home that day with his abuser. Id. at 247. When the teachers were questioning the child, their objective was "to protect" him, "not to arrest or punish his abuser"; they "were not sure who had abused him or how best to secure his safety." Id.

¶31 The Court held that the Confrontation Clause applied to "at least some statements made to individuals who are not law enforcement," but not the child's statements here. Id. at 246. Reiterating Bryant's guidance to consider all of the relevant circumstances, the Court explained that "[c]ourts must evaluate challenged statements in context, and part of that context is the questioner's identity." Id. at 249 (explaining that it is "common sense that the relationship between a student and his teacher is very different from that between a citizen and the police"). The Court then considered "all the relevant circumstances," including the child's age, the school setting, the teachers' objective, and the overall informality of the

18

situation, and concluded that the primary purpose of the child's statements was not to "creat[e] evidence" for Clark's prosecution.  Id. at 246.  Although the Court again "decline[d] to adopt a categorical rule" on the issue, id., it pointed out that statements by someone as young as this child "will rarely, if ever, implicate the Confrontation Clause," id. at 248.

C

¶32 Bryant and Clark neither contradicted Crawford or Davis nor drastically altered the Confrontation Clause analysis. Given that both Crawford and Davis declined to "comprehensive[ly]" define "testimonial statement," it was inevitable that future cases like Bryant and Clark would further refine that term.  See Crawford, 541 U.S. at 68; Davis, 547 U.S. at 821-22.  In the "new context" of a potential threat to the responding police and the public at large, Bryant "provide[d] additional clarification with regard to what Davis meant by 'the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.'"  Bryant, 562 U.S. at 359.  Similarly, in Clark, the Court applied the primary purpose test to answer a question it had "repeatedly reserved: whether statements made to persons other than law enforcement officers are subject to the Confrontation Clause." Clark, 576 U.S. at 246.

¶33 The Court's own reflections on its post-Crawford decisions demonstrate that it did not see those decisions as contradicting Crawford or Davis but rather as efforts to "flesh out" the test it first articulated there.  See id. at 243-46;

19

see also id. at 252 (Scalia, J., concurring) (plainly stating in 2015 that Crawford "remains the law"). Federal courts of appeals' interpretations of Bryant and Clark confirm that progression. See, e.g., United States v. Norwood, 982 F.3d 1032, 1043-44 (7th Cir. 2020); Issa v. Bradshaw, 910 F.3d 872, 876 (6th Cir. 2018); United States v. Lebeau, 867 F.3d 960, 980 (8th Cir. 2017). The Seventh Circuit Court of Appeals, for instance, recently noted that Bryant "further elaborated" on Davis's ongoing emergency analysis by "ma[king] clear that the totality of the circumstances guides the primary purpose test, not any one factor." Norwood, 982 F.3d at 1043-44 (emphasis removed). That court has likewise cited Clark as a continuation in the primary purpose test's development. See, e.g., United States v. Amaya, 828 F.3d 518, 528-29, 529 n.4 (7th Cir. 2016).

¶34 Our recent jurisprudence also reveals that Crawford and Davis——and therefore our analysis in Jensen I——have not been contradicted. Even after Bryant and Clark, we continue to cite Crawford and Davis in resolving whether an unavailable witness's statement is testimonial. See State v. Reinwand, 2019 WI 25, ¶¶19-22, 385 Wis. 2d 700, 924 N.W.2d 184; State v. Nieves, 2017 WI 69, ¶¶26-29, 376 Wis. 2d 300, 897 N.W.2d 363; State v. Zamzow, 2017 WI 29, ¶13, 374 Wis. 2d 220, 892 N.W.2d 367; State v. Mattox, 2017 WI 9, ¶¶24-25, 373 Wis. 2d 122, 890 N.W.2d 256. Even more to the point, on the limited occasions we have cited Bryant or Clark, we have interpreted them as continuing to apply the primary purpose test. See Reinwand, 385 Wis. 2d 700,

20

¶¶22, 24; Mattox, 373 Wis. 2d 122, ¶32 ("Clark reaffirms the primary purpose test"). We have never interpreted Bryant or Clark to be a departure from Crawford or Davis, much less the type of drastic departure required to justify deviating from the law of the case.

¶35 In some ways, Jensen I anticipated Bryant and Clark. For instance, we decided Jensen I by not only analyzing the content of Julie's statements but also objectively evaluating the relevant "circumstances" under which she made them. Jensen I, 299 Wis. 2d 267, ¶¶26-30. That is what the United States Supreme Court held in Bryant. See 562 U.S. at 359 (requiring courts to "objectively evaluate the circumstances" surrounding the statement's creation when determining its primary purpose). In Jensen I, we rejected the State's argument that "the government needs to be involved in the creation of the statement" for that statement to be testimonial. See Jensen I, 299 Wis. 2d 267, ¶24. This mirrors the holding in Clark. See 576 U.S. at 246 (recognizing that "at least some statements to individuals who are not law enforcement officers could conceivably raise confrontation concerns"). Far from being contrary to Jensen I, Bryant and Clark are consistent with it.

IV

¶36 Our decision in Jensen I that Julie's statements constituted testimonial hearsay established the law of the case. Subsequent developments in the law on testimonial hearsay are not contrary to Jensen I. Therefore, the circuit court was not

21

permitted to deviate from our holding in Jensen I.  Accordingly, we affirm the court of appeals' decision.  We modify that decision, however, to the extent that the court of appeals incorrectly relied upon Cook.

*By the Court.*—The decision of the court of appeals is modified, and as modified, affirmed.

¶37 JILL J. KAROFSKY, J. (*concurring*). I join the majority opinion, with the exception of ¶35, because I agree that our decision in Jensen I that Julie's statements constituted testimonial hearsay established the law of the case and a controlling court has not issued a contrary decision on the same point of law. State v. Jensen (Jensen I), 2007 WI 26, 299 Wis. 2d 267, 727 N.W.2d 518. I write separately, however, because I disagree with the majority's assertion that the Jensen I court "objectively evaluat[ed] the relevant 'circumstances' under which she made [her statements]." Majority op., ¶35. In other words, I conclude that the Jensen I court completely failed to consider the context in which Julie made her statements.

¶38 Had this court in Jensen I truly considered that context, it would have recognized that Julie was undeniably a victim of domestic abuse and that prior to her death she lived in terror born of the unimaginable fear that her husband was going to kill her and claim that her death was a suicide. It was under these circumstances that she left two voicemails for Pleasant Prairie Police Officer Ron Kosman and wrote a letter which she gave to a neighbor with instructions to give it to the police should anything happen to her.

¶39 This writing begins with a discussion of domestic abuse and how Crawford v. Washington, 541 U.S. 36 (2004), impacted the prosecution of domestic abuse cases. Next, I summarize the United States Supreme Court's decisions in Crawford, Davis v. Washington, 547 U.S. 813 (2006), and Davis'

1

companion case, Hammon v. Indiana. I follow with an examination of Jensen I, since it was decided less than a year after Davis and Hammon, and with a discussion of three cases from the United States Supreme Court and this court that were decided post-Jensen I. This case overview reveals how the United States Supreme Court and this court have increasingly given weight to context when assessing whether the hearsay statement of an unavailable witness is testimonial in nature. Next, to assist future courts in assessing context, I supply a non-exhaustive list of contextual questions based off the previously summarized cases. Finally, I conclude this concurrence with a discussion of assessing context in domestic abuse cases and an objective evaluation of the circumstances under which Julie made her statements.

## I. DOMESTIC ABUSE AND VICTIMLESS PROSECUTION

¶40 Domestic abuse, or interpersonal violence, is a significant public health issue. About one in four women and one in seven men have experienced an act of physical violence from an intimate partner in their lifetime. Caitlin Valiulis, Domestic Violence, 15 Geo. J. Gender & L. 123, 124 (2014). In addition, and far more sobering, the nation's crime data suggests that over half of female homicide victims in the United States are killed by a current or former intimate partner. See Natalie Nanasi, Disarming Domestic Abusers, 14 Harv. L. & Pol'y Rev. 559, 563 & n.16 (2020) (citing statistics from the Center for Disease Control and Prevention regarding the role of intimate partner violence).

2

¶41 To counteract this public health issue, prosecutors have worked to hold abusers accountable. This is often a difficult, if not impossible, task because abusers' actions often render their victims unavailable to testify. Beginning in the mid-1990s, prosecutors pursued these so-called "victimless" prosecutions by seeking to introduce reliable evidence using victims' out-of-court statements through 911 operators, medical professionals, social workers, and law enforcement officers. See Andrew King-Ries, Crawford v. Washington: The End of Victimless Prosecution?, 28 Seattle U. L. Rev. 301 (2005). Victim advocates and prosecutors applauded this approach because it maintained victims' safety and avoided retraumatization. Id. This practice, however, came to a screeching halt after the United States Supreme Court's decision in Crawford,[1] in which the Court profoundly altered the analysis as to when an unavailable witness's hearsay statement is admissible under the Confrontation Clause of the Sixth Amendment.

---

[1] In a 2004 survey of 64 prosecutors' offices in California, Oregon, and Washington, 63 percent of respondents reported that Crawford v. Washington, 541 U.S. 36 (2004) had significantly impeded domestic violence prosecution. Tom Lininger, Prosecuting Batterers After Crawford, 91 Va. L. Rev. 747, 750 (2005). Further, 76 percent of respondents indicated that after Crawford their offices were more likely to dismiss domestic violence charges when the victims refused to cooperate or were unavailable. Id. at 773.

## II. PRECEDENT FROM THE UNITED STATES SUPREME COURT ABOUT NONTESTIMONIAL HEARSAY

¶42 In Crawford, the United States Supreme Court fundamentally changed the analysis regarding the admissibility of an out-of-court witness's statement by deciding that when such a statement is testimonial in nature, the witness must testify and face cross-examination. 541 U.S. at 68. Consequently, if that witness is unavailable, his or her testimony will be excluded. Id. The Crawford Court did not further explain what it meant by "testimonial." Writing for the majority, Justice Scalia reasoned:

> Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination. We leave for another day any effort to spell out a comprehensive definition of 'testimonial.' Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations.

Id. (Footnote omitted.)

¶43 The United States Supreme Court first applied its reasoning in Crawford to situations of domestic abuse in Davis and Hammon. In doing so, the Court created a primary-purpose test to determine whether or not a statement is testimonial. In short, the test is designed to ascertain whether the primary purpose of an interrogation is to enable police to meet an ongoing emergency. Statements are "testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." Davis, 547 U.S. at 822.

4

¶44 In Davis, the Court analyzed a 911 call in which the victim reported that Davis was "jumpin' on [her] again" and beating her with his fists. Id. at 817. The victim also "described the context of the assault" and gave identifying information about Davis. Id. at 818. The Court held that these statements were admissible because their primary purpose was to "enable police assistance to meet an ongoing emergency." Id. at 828.[2] The Court distinguished this statement from the one at issue in Crawford, reasoning that the statements were made "as they were actually happening" and while the victim was "in immediate danger." Id. at 827, 831 (emphasis in original). The Court also determined that the statements were helpful to the police because they allowed them to assess any potential threats towards them or the victim. Id. at 832. In sum, the Court decided that the victim was not testifying because "[n]o 'witness' goes into court to proclaim an emergency and seek help." Id. at 828.

---

[2] The Davis Court described these statements as "frantic," 547 U.S. at 827, a word that connotes a lack of thought or good judgment. This type of language is emblematic of the obstacles domestic abuse victims face in effectively conveying the truth of their experiences to institutional gatekeepers. "[D]omestic violence complainants can find themselves in a double bind. The symptoms of their trauma—the reliable indicators that abuse has in fact occurred—are perversely wielded against their own credibility in court. [Post-traumatic stress disorder] symptoms can . . . contribute to credibility discounts that may be imposed by police, prosecutors, and judges." Deborah Epstein & Lisa A. Goodman, Discounting Women: Doubting Domestic Violence Survivors' Credibility and Dismissing Their Experiences, 167 U. Penn. L. Rev. 399, 422 (2019).

5

¶45 The Court reached a different conclusion in Hammon, in which police called to a domestic violence incident found the victim on the front porch and Hammon inside the house. Id. at 819. As part of their investigation, the officers asked the victim to fill out and sign a "battery affidavit." Id. at 820. In filling out the affidavit, the victim described how Hammon broke a glass heater, pushed her into the broken glass, hit her in the chest, prevented her from leaving by damaging her van, and attacked her daughter. Id. The Court determined the primary purpose of this statement was to provide a "narrative of past events," and the Court reasoned that giving a statement about past events meant there was "no emergency in progress." Id. at 829, 832. For these reasons, the Court decided the victim's affidavit was inadmissible hearsay. Id. at 834.

### III. JENSEN I

¶46 Shortly after the United States Supreme Court decided Davis and Hammon, this court determined in Jensen I that the primary purpose of Julie's letter was not to help the police in an ongoing emergency, but to "investigate or aid in prosecution in the event of her death." Jensen I, 299 Wis. 2d 267, ¶27. Additionally, the court also reasoned that the voicemails "were entirely for accusatory and prosecutorial purposes." Id., ¶30.

¶47 In Julie's second voicemail, she told Officer Kosman that she thought Jensen was going to kill her. The letter that Julie gave her neighbor read as follows:

> I took this picture [and] am writing this on Saturday 11-21-98 at 7AM. This 'list' was in my husband's business daily planner—not meant for me to see, I don't know what it means, but if anything happens to

6

me, he would be my first suspect. Our relationship has deteriorated to the polite superficial. I know he's never forgiven me for the brief affair I had with that creep seven years ago. Mark lives for work [and] the kids; he's an avid surfer of the Internet....

Anyway—I do not smoke or drink. My mother was an alcoholic, so I limit my drinking to one or two a week. Mark wants me to drink more—with him in the evenings. I don't. I would never take my life because of my kids— they are everything to me! I regularly take Tylenol [and] multi-vitamins; occasionally take OTC stuff for colds, Zantac, or Immodium; have one prescription for migraine tablets, which Mark use[s] more than I.

I pray I'm wrong [and] nothing happens . . . but I am suspicious of Mark's suspicious behaviors [and] fear for my early demise. However, I will not leave David [and] Douglas. My life's greatest love, accomplishment and wish: "My 3 D's"—Daddy (Mark), David [and] Douglas.

Id., ¶7.

¶48 Although the record in this case was replete with references to domestic abuse and the Jensen I majority took great pains to explain that it reached its decision by examining "[t]he content and the circumstances surrounding the letter" and applied the same reasoning to the voicemails, id., ¶27, nowhere in the majority opinion, not even in a passing phrase or fleeting word, did this court acknowledge that Julie was the victim of domestic abuse. Instead, employing an ill-suited analogy, the majority compared Julie's letter and voicemails to Lord Cobham's letter at Sir Walter Raleigh's trial for treason. Id., ¶29. Drawing a parallel between a 1603 treason trial—where Cobham, the missing (but still very much alive) accomplice, wrote a letter maintaining his innocence while accusing Raleigh— and a 1998 domestic homicide makes for a particularly inapt

7

analogy; it draws a comparison remote in time, place, content, and circumstance in every possible aspect.

IV.  POST-JENSEN I

¶49 Post-Jensen I, the United States Supreme Court issued two decisions that further illuminated the import of assessing context when courts are determining the primary purpose of an unavailable witness's hearsay statement, Michigan v. Bryant, 562 U.S. 344 (2011), and Ohio v. Clark, 576 U.S. 237 (2015).  In Bryant, the police found a gunshot victim at a gas station.  562 U.S. at 349.  Although the victim was bleeding profusely and was having trouble speaking, he told police that Bryant shot him through the back door of Bryant's house.  Id.  Unfortunately, the victim died within hours.  Id.  The Bryant Court decided that the victim's statement was admissible because its primary purpose was to help the police resolve an ongoing emergency, especially in light of the fact that Bryant posed an ongoing threat to the community at large.  Id. at 371-73.  The Court emphasized that determining the primary purpose of a statement is an objective test and clarified that an ongoing emergency is only one factor to be considered.  Id. at 360, 366.  The Court outlined other important factors, including the statements and actions of both the declarant and the interrogators, and the formality of the encounter.  Id. at 366-67.  The court noted that victims may have "mixed motives" when making a statement to the police.  Id. at 368 ("During an ongoing emergency, a victim is most likely to want the threat to her and to other potential

8

victims to end, but that does not necessarily mean that the victim wants or envisions prosecution of the assailant.").

¶50 Clark, 576 U.S. 237, involved a different type of violence in the home: child abuse. In that case, Clark was accused of abusing his girlfriend's three-year old son after the victim disclosed the abuse to a teacher who observed visible injuries on the boy's body. Id. at 240-41. The statements to the teacher were determined to be nontestimonial because the teacher's objective in asking questions was to protect the victim, not to arrest or punish his abuser. Id. at 247. The Clark Court reiterated the importance of context, explaining "[c]ourts must evaluate challenged statements in context, and part of that context is the questioner's identity." Id. at 249. In considering "all the relevant circumstances," including the child's age, the school setting, the teacher's objective, and the overarching informality of the situation, the Court concluded that the primary purpose of the victim's statements was not to "creat[e] evidence" for Clark's prosecution. Id. at 246. Rather, the teacher's questions were intended to identify the abuser "to protect the victim from future attacks." Id. at 247.

¶51 Subsequently, we interpreted Clark in Reinwand, in which Joseph Reinwand was convicted of first-degree intentional homicide for killing his daughter's former partner. State v. Reinwand, 2019 WI 25, 385 Wis. 2d 700, 924 N.W.2d 184. Reinwand's daughter and the victim were planning to mediate a custody dispute and in the days leading up to the mediation,

9

Reinwand threatened to harm or kill the victim if he continued to seek custody. Id., ¶6. The victim reported these threats to family and friends, saying he was scared for his life and that if anything happened to him, people should look to Reinwand. Id. A short time later, the victim was found dead in his home. This court looked to four relevant factors in deciding whether Reinwand's statements were testimonial:

> (1) the formality/informality of the situation producing the out-of-court statement; (2) whether the statement is given to law enforcement or a non-law enforcement individual; (3) the age of the declarant; and (4) the context in which the statement was given.

Id., ¶25 (citing State v. Mattox, 2017 WI 9, ¶32, 373 Wis. 2d 122, 890 N.W.2d 256).

¶52 The Reinwand court concluded that the statements were nontestimonial because: (1) they were given in informal situations, primarily inside people's houses and at an Arby's restaurant; (2) none of the statements were given to law enforcement or intended for law enforcement; (3) the age of the victim was irrelevant; and (4) the victim's statements were made to friends and family and his demeanor suggested genuine concern because he seemed "concerned, stressed, agitated . . . and genuinely frightened." Id., ¶¶27-30. The court concluded that the victim's "demeanor suggests that he was expressing genuine concern and seeking advice, rather than attempting to create a substitute for trial testimony." Id., ¶30.

## V. ASSESSING CONTEXT

¶53 The post-Crawford cases emphasized the importance of assessing context when courts are determining whether the

10

hearsay statement of an unavailable witness is testimonial. The following non-exhaustive list of questions summarizes the contextual inquiries the United States Supreme Court and this court made in post-Crawford cases:

- Is there an ongoing emergency? (Davis)
- Do the statements help the police assess whether there is a potential threat? (Davis)
- Is the victim in immediate danger? (Davis)
- Is the statement a narrative of past events? (Hammon)
- Is the statement related to an ongoing threat to the community at large? (Bryant)
- What's the declarant's actual statement? (Bryant)
- What are the actions of the declarant? (Bryant)
- What are the actions and statements of the interrogators? (Bryant)
- Are the interrogators' intentions to protect the victim or arrest/prosecute the abuser? (Clark)
- Is the encounter formal (at a police station) or informal? (Bryant)
- Was the statement given to law enforcement? (Clark)
- Were the statements intended for law enforcement? (Clark)
- How old is the declarant? (Clark)
- What is the relationship between the declarant and the suspect? (Clark)
- What was the demeanor of the declarant at the time the statements were made? (Reinwand)

11

- Is the statement a prediction of future events? (Reinwand)

### VI. CONTEXT IN DOMESTIC ABUSE CASES

¶54 Applying the above considerations to situations of domestic abuse can be challenging because domestic abuse rarely takes place in a vacuum. That is, there are often multiple incidents and the abuse can span the course of days, weeks, months, or years. See, e.g., Eleanor Simon, Confrontation and Domestic Violence Post-Davis: Is There and Should There Be a Doctrinal Exception?, 17 Mich. J. Gender & L. 175, 206 (2011) ("[A] domestic violence victim exists in a relationship defined by long-term, ongoing, powerful, and continuous abuse . . . it is illogical and impractical to attempt to find the beginning and end of an 'emergency' in such a context."). In addition, victims of domestic abuse are often afraid to report acts of violence, or they recant or refuse to cooperate after initially providing information because they fear retaliation. Id. at 184-85. Therefore, victims may not make a report or they may minimize or deny incidents of abuse. It is also important to understand that no one knows an abuser better than the abuser's victim. And the most dangerous time for a victim of domestic abuse is when he or she decides to leave the relationship. See Lisa A. Goodman & Deborah Epstein, Listening to Battered Women: A Survivor-Centered Approach to Advocacy, Mental Health, and Justice 76 (2008) ("Substantial data show that separation from the batterer is the time of greatest risk of serious violence and homicide for battered women and for their children.").

¶55 Having suggested some contextual questions and acknowledging the challenges of understanding context in cases of domestic abuse, I conclude this concurrence by objectively evaluating the relevant circumstances under which Julie made her statements, a task the majority opinion erroneously claims the Jensen I court did. That evaluation reveals that Julie:

- was a victim of domestic abuse;
- believed there was an ongoing emergency as she feared her husband was going to kill her;
- perceived herself to be in immediate danger because her husband was engaging in behavior that did not make sense to her;
- had significant safety concerns;
- was afraid her death was going to be made to look like a suicide;
- loved her sons;
- wanted her sons to know she did not intend to kill herself;
- was making a prediction about her husband's future behavior;
- was not questioned/interrogated in this case; and
- did not have a formal encounter in a police station.

¶56 When looking at this evidence in context, it is apparent that Julie was a victim of domestic abuse and that prior to her death she lived in terror born of the unimaginable fear that her husband was going to kill her and claim that her death was a suicide. It was under these circumstances that she

13

left the voicemail messages for Officer Kosman and wrote the letter which she gave to a neighbor with instructions to give it to the police should anything happen to her.

¶57 With this context in mind, we must ask: Was Julie making statements for the future prosecution of her husband for her murder? Or was she a woman trying to survive ongoing domestic abuse, fearing and predicting an imminent attempt on her life, telling her sons that she loved them too much to commit suicide? This is the voice——Julie's voice——that this court failed to acknowledge in Jensen I.

¶58 Although the law of the case prohibits this court from reconsidering the determinations reached by the Jensen I court, had the Jensen I court actually "objectively evaluat[ed] the relevant circumstances" surrounding Julie's statements, it would have recognized the atmosphere of domestic abuse that suffused the factual background and the relationship at the center of this case and possibly reached a different conclusion.

¶59 For the foregoing reasons, I concur.

¶60 I am authorized to state that Justice ANNETTE KINGSLAND ZIEGLER joins this concurrence.

14