COURT OF APPEALS
DECISION
DATED AND FILED

April 10, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal Nos.** 2023AP876-CR
2023AP877-CR
2023AP878-CR

Cir. Ct. Nos. 2019CF729
2019CF1178
2019CF1184

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT IV

---

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

V.

BRIAN THOMAS JAVIER,

   DEFENDANT-APPELLANT.

---

APPEAL from judgments and an order of the circuit court for Rock County: JOHN M. WOOD, Judge. *Affirmed*.

Before Kloppenburg, P.J., Blanchard, and Taylor, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Brian Javier appeals judgments of conviction for multiple offenses arising out of domestic violence incidents involving B.C.[1] Javier also appeals the circuit court's order denying his motion for postconviction relief. He argues that: (1) his right to confrontation was violated by the admission, at trial, of a police body camera video that contained the recorded statements of a child witness, B.C.'s six-year-old son, X.Y.; (2) trial counsel was ineffective by failing to subpoena X.Y. to testify; (3) the circuit court erred by not individually polling the jurors; (4) trial counsel was ineffective by failing to request individual polling; and (5) the prosecutor engaged in misconduct during closing arguments. We affirm.

## *Background*

¶2 Police officers were dispatched to B.C.'s home in response to a 911 call from B.C.'s neighbor. An officer made contact with the neighbor. The neighbor told police that he had called 911 because a young child had done the following: run to the neighbor's house, told the neighbor that someone was beating his mother, and asked the neighbor to call 911.

¶3 The police made contact with B.C. at her residence, where X.Y. was also present. A vehicle registered to Javier was in the driveway, but Javier did not appear to be at B.C.'s residence.

¶4 An officer began attempting to interview B.C., but she was generally not willing to provide information. When the officer asked B.C. "who it was

---

[1] We refer to "B.C." using initials that do not correspond to her real name, to protect her privacy. *See* WIS. STAT. RULE 809.86 (2023-24). We likewise refer to her child as "X.Y.," using initials that do not correspond to his real name.

All references to the Wisconsin Statutes are to the 2023-24 version unless otherwise noted.

because [the officer] had seen the [car license] plate of [Javier] in the driveway," X.Y. yelled out that it was "Brian," an apparent reference to Javier. B.C. continued to generally decline to answer the officer's questions, and the officer decided to interview X.Y., given B.C.'s lack of cooperation.

¶5 The officer took X.Y. aside, into the kitchen and out of B.C.'s presence, to interview him. As part of the interview, the officer asked X.Y. questions relating to whether X.Y. understood the difference between the truth and a lie. During the interview, X.Y. told the officer, among other things, that he had seen Javier hit his mother twice.

¶6 At trial, the prosecution did not call X.Y. to testify. Over Javier's objection, the circuit court allowed the prosecutor to introduce the contents of the officer's body camera video reflecting X.Y.'s recorded statements. The jury found Javier guilty of multiple acts of domestic violence against B.C.

¶7 We reference additional facts as needed below.

***Discussion***

*1. Body Camera Video Containing X.Y.'s Recorded Statements*

¶8 Javier argues that the circuit court erred by admitting the contents of the police body camera video reflecting X.Y.'s recorded statements. He argues that

3

the admission of these statements, without X.Y. being available for cross-examination at trial, violated his right to confrontation.[2]

¶9      Whether the admission of an out-of-court statement into evidence violates a defendant's right to confrontation is an issue of constitutional law that this court reviews de novo. *State v. Reinwand*, 2019 WI 25, ¶17, 385 Wis. 2d 700, 924 N.W.2d 184. However, we will not set aside the circuit court's underlying factual findings unless the court's findings are clearly erroneous. *See **State v. Tullberg***, 2014 WI 134, ¶27, 359 Wis. 2d 421, 857 N.W.2d 120.

¶10      "[T]he Confrontation Clause applies only to statements that are testimonial in nature." ***Reinwand***, 385 Wis. 2d 700, ¶22. Here, Javier argues that X.Y.'s recorded statements are testimonial. The State disagrees.

¶11      "A statement is testimonial only if in light of all the circumstances, viewed objectively, the primary purpose of the conversation was to create an out-of-court substitute for trial testimony." *Id.*, ¶24 (internal quotation marks and quoted source omitted). "This 'primary purpose' test is an objective test." *Id.* "'[T]he relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred.'" *Id.* (quoted source omitted).

---

[2] Javier also asserts that X.Y.'s statements were hearsay, but Javier does not develop any argument explaining why the circuit court was wrong to conclude that multiple hearsay exceptions applied to the statements. Accordingly, we do not address any hearsay-related issue. *See **State v. Pettit***, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992) (explaining that the court of appeals may decline to review issues that are inadequately briefed).

4

¶12    The factors courts consider in deciding whether statements are testimonial include each of the following: "'(1) the formality/informality of the situation producing the out-of-court statement; (2) whether the statement is given to law enforcement or a non-law enforcement individual; (3) the age of the declarant; and (4) the context in which the statement was given.'" *Id.*, ¶25 (quoted source omitted). No single factor is determinative, nor are these factors exhaustive. "In determining whether a declarant's statements are testimonial, courts should look to all of the relevant circumstances." *Michigan v. Bryant*, 562 U.S. 344, 369 (2011).[3]

¶13    Javier argues that the four factors support a conclusion that X.Y.'s statements are testimonial. As to the first and third factors, Javier argues that the interview of X.Y. was a formal police interview. He argues that, although the interview was conducted in the kitchen of a private home, the interview was formal because it was conducted by an armed and uniformed officer; because it took place out of the presence of X.Y.'s mother; and because the officer began by asking X.Y. whether X.Y. understood the difference between the truth and a lie. As to the second factor, Javier argues that although X.Y. was only six years old at the time, X.Y. was old enough to understand that his statements could be "used in the future." As to the fourth factor, Javier argues that the relevant context is that the police interview occurred as part of an investigation of a reported crime.

¶14    The State counters that the four-factor test, on balance, supports a conclusion that X.Y.'s statements are not testimonial. As to the first factor, the State

---

[3] This four-factor test is based on federal case law as interpreted and adopted by our supreme court. *See State v. Reinwand*, 2019 WI 25, ¶25, 385 Wis. 2d 700, 924 N.W.2d 184. Javier argues that we should interpret the Wisconsin Constitution to provide broader confrontation protections than the United States Constitution. However, Javier does not develop an argument explaining how we could do that in a manner consistent with our obligation to follow our supreme court's decisions. Accordingly, we do not further consider Javier's state constitutional argument.

argues that the interview was informal, as compared to a formal interrogation at a police station. The State also argues that the evidence and the circuit court's factual findings reflect the informality of the interview in other aspects, including that the officer allowed X.Y. to freely move about the kitchen.

¶15     As to the second factor, the State argues that case law supports a conclusion that statements by very young children are rarely considered testimonial. As to the third factor, the State acknowledges that questioning by a law enforcement officer is a circumstance that generally weighs in favor of a conclusion that statements provided in response are testimonial.

¶16     As to the fourth factor, the State argues that the broader context shows that the primary purpose of the interview was not to preserve X.Y.'s statements for a future prosecution, but instead to resolve a potentially ongoing domestic abuse incident and prevent further abuse. The State cites case law providing that "[w]hether an ongoing emergency exists" is a factor in determining whether a statement's primary purpose is testimonial. *See **State v. Jensen***, 2021 WI 27, ¶29, 396 Wis. 2d 196, 957 N.W.2d 244.

¶17     In support of this primary purpose argument, the State argues that the evidence and the circuit court's factual findings in this case establish all of the following. X.Y. had run to a neighbor's house to report that someone was beating his mother, B.C. This report by X.Y. prompted the neighbor's 911 call to the police. When the police arrived at B.C.'s residence, she was not responsive to police questioning, apparently unwilling to implicate a person who had apparently abused her. X.Y. was scared and trying to protect his mother. The police were responding to a situation in which they did not immediately know who the alleged perpetrator was or whether the alleged perpetrator would return. According to the State, given

this overall context, the officer's interview of X.Y. was primarily directed at discovering what had happened in order to resolve an emergency situation and to protect B.C. and her family from what police feared might be further abuse.

¶18 On the whole, we are more persuaded by the State's arguments on the four-factor test. We conclude that the relevant circumstances, on balance, favor a conclusion that X.Y.'s statements are not testimonial.

¶19 As to the first factor, we agree with the State that the interview was relatively informal and that it was not akin to a traditional police interview at the station. We acknowledge that questions relating to whether a child understands the difference between the truth and a lie are suggestive of an intent by the questioner to preserve a child's statements for a court proceeding. However, Javier's limited argument regarding such questions does not persuade us that the primary purpose of the interview here was to create a substitute for trial testimony.

¶20 As to the second factor, there is no dispute that the fact that statements were obtained during a police interview is generally a circumstance weighing in favor of a conclusion that the statements are testimonial. However, as noted above, no single factor is dispositive.[4]

¶21 As to the third factor, we agree with the State that X.Y.'s relatively young age, although not by itself dispositive, is a highly significant factor weighing in favor of a conclusion that X.Y.'s statements are not testimonial. Adopting U.S.

---

[4] As referenced in the text, X.Y.'s initial statement that incriminated Javier occurred before the officer began interviewing X.Y. Javier's arguments do not come to grips with this statement. Rather, Javier makes a blanket argument that all of X.Y.'s statements are testimonial, without identifying each of the particular statements and the immediate context surrounding them, such as whether each statement was in direct response to a question by the officer.

Supreme Court case law, our supreme court has concluded that "[s]tatements by very young children will rarely, if ever, implicate the Confrontation Clause, because very young children have little understanding of prosecution and would not likely intend their statements to be a substitute for trial testimony." *Reinwand*, 385 Wis. 2d 700, ¶29 (quoting *Ohio v. Clark*, 576 U.S. 237, 247-48 (2015) (internal quotation marks omitted)). The age of six might be toward the high end of "very young," but it is nevertheless a young age. Here, Javier points to no evidence to suggest that this six-year-old would have understood or intended that his statements might be used in a criminal prosecution.

¶22 As to the fourth and final factor, Javier does not persuade us that the overall context shows that the officer's interview of X.Y. and X.Y.'s statements were primarily for the purpose of a later prosecution. As the State argues, the circuit court made factual findings supporting a conclusion that the primary purpose of the interview and X.Y.'s statements was to address a potentially ongoing domestic abuse incident and to prevent further abuse from occurring. Javier does not argue, let alone establish with references to the record, that these findings are clearly erroneous.

*2. Counsel's Decision Not to Subpoena X.Y. to Testify*

¶23 Javier argues that trial counsel was ineffective by failing to subpoena X.Y. to testify. For the following reasons, we disagree.

¶24 To demonstrate ineffective assistance of counsel, a defendant must establish both (1) that counsel's performance was deficient, and (2) that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

8

¶25 To establish deficient performance, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 687-88. "[T]he defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoted source omitted).

¶26 To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

¶27 Here, the circuit court held a ***Machner***[5] hearing with testimony from trial counsel. Counsel testified that he made a strategic decision not to seek X.Y.'s testimony at trial because, having considered X.Y.'s recorded statements, counsel did not believe that X.Y.'s live testimony would have supported Javier's defense.

¶28 Counsel's testimony provides a presumptively reasonable strategic reason for counsel's decision not to subpoena X.Y. Further, based on counsel's testimony, the circuit court made factual findings relating to counsel's strategy and ultimately found that the strategy was a sound one. Javier does not address these findings, nor has he filed a reply brief refuting the State's arguments on these points. For these reasons, we conclude that Javier has not shown that counsel performed deficiently. *See **United Coop. v. Frontier FS Coop.***, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578 (An appellant's failure to reply to an argument in the respondent's brief may be taken as a concession.).

_____

[5] ***State v. Machner***, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

¶29 Moreover, Javier fails to show prejudice based on counsel's decision not to seek X.Y.'s testimony. Javier does not explain what X.Y.'s testimony would have been or why it would have had a reasonable probability of producing a different result at trial.

### 3. Lack of Individual Jury Polling by Circuit Court

¶30 Javier argues that the circuit court erred by failing to individually poll the jurors on their verdicts. We disagree. When the jury returned its verdicts, the court repeatedly offered to individually poll the jurors. However, in each instance, the parties declined. As the State points out, the court is not required to poll jurors when there is no request for polling. *See* **State v. Jackson**, 188 Wis. 2d 537, 541, 525 N.W.2d 165 (Ct. App. 1994) (explaining that "[t]he right to poll the jury is not compulsory"). Rather, "defendants may waive their right by failing to ask for it in the first instance, or by failing to ask for additional polling when given the opportunity to request it." **State v. Raye**, 2005 WI 68, ¶20, 281 Wis. 2d 339, 697 N.W.2d 407. Javier cites no binding authority that requires individual polling when not requested.

### 4. Counsel's Decision Not to Request Individual Polling

¶31 Javier argues that trial counsel was ineffective by failing to request individual polling. The basis for this argument is not well developed, but Javier appears to be arguing that it was ineffective for counsel not to request individual polling because there were irregularities at trial relating to (1) a jury question during deliberations, and (2) the presiding juror's signature on some of the verdict forms.

¶32 As to the jury's question, the jury sent out a note asking the following: "What is the Count five of the amended Information from Dec. 3rd, 2019, charge?"

10

Count 5 in the amended Information was a charge of felony bail jumping predicated on Javier's alleged commission of the crime of obstructing an officer, as charged in Count 4 of the amended Information. Consistent with the amended Information, and with the agreement of both parties, the circuit court answered the jury's question as follows: "Count five correctly charges felony bail jumping for the alleged commission of a new crime on December 3, 2019; namely, Count four, which alleges obstructing an officer."

¶33 Javier argues that the circuit court's use of the phrase "*correctly* charges" (emphasis added) implied that he was guilty. We disagree that reasonable jurors would have understood the court's phrasing this way. Further, in terms of ineffective assistance of counsel, Javier does not draw any connection between this alleged court error and the desirability of individual polling of the jury.

¶34 As to the presiding juror's signature on the verdict forms, the record before us reflects that the presiding juror mistakenly signed "not guilty" forms on a subset of charges, then wrote "wrong" on those forms and signed the "guilty" forms for these charges. The circuit court verified on the record that this is what had occurred by questioning the presiding juror. The court also verified on the record that the guilty verdict forms reflected the jury's actual verdicts by asking the jurors as a group to confirm that those were their verdicts, which they did. Javier provides no reason to conclude that individual polling would have been reasonably likely to reveal that the presiding juror's signature on the "not guilty" forms was anything other than a scrivener's error.

¶35 In sum on this issue, Javier fails to show deficient performance or prejudice.

### 5. Prosecutor's Closing Arguments

¶36 Javier argues that the prosecutor engaged in misconduct during closing arguments in two ways. For the reasons we now explain, we reject these arguments.

¶37 Alleged prosecutorial misconduct "'can rise to such a level that the defendant is denied his or her due process right to a fair trial.'" *State v. Lettice*, 205 Wis. 2d 347, 352, 556 N.W.2d 376 (Ct. App. 1996) (quoted source omitted). "If the misconduct 'poisons the entire atmosphere of the trial,' it violates due process." *Id.* (quoted source omitted). "Reversing a criminal conviction on the basis of prosecutorial misconduct is a 'drastic step' that 'should be approached with caution.'" *Id.* (quoted source omitted).

¶38 The first allegation of prosecutorial misconduct is that the prosecutor in his closing argument told the jury that it could convict Javier on a charge of disorderly conduct based on any of multiple alleged acts. According to Javier, this "in-the-alternative" statement improperly allowed the jurors to find him guilty without all jurors agreeing on which disorderly act he committed.

¶39 The State contends that the prosecutor's statement was not improper because it was consistent with case law providing that jurors do not need to agree on which disorderly act a defendant committed. The State cites *Doubek v. Kaul*, 2022 WI 31, ¶14, 401 Wis. 2d 575, 973 N.W.2d 756 (holding that "Wisconsin's disorderly conduct statute is indivisible, and enumerates different means of committing the same crime"); and *Holland v. State*, 91 Wis. 2d 134, 143, 280 N.W.2d 288 (1979) (explaining that "unanimity is not required with respect to the alternative means or ways in which [a] crime can be committed").

12

¶40    Javier does not cite any case law to the contrary, nor does he address the case law on which the State relies. Accordingly, Javier does not persuade us that the prosecutor engaged in misconduct by telling the jury that it could convict Javier based on any of multiple alleged disorderly acts.

¶41    Javier's second prosecutorial misconduct argument relates to alibis that Javier provided to the police and whether the prosecutor impermissibly shifted the burden of proof in remarks relating to those alibis. Javier relies on portions of the prosecutor's closing arguments in which the prosecutor said that (1) Javier provided the police with two false and inconsistent alibis, one of which formed the basis for the obstruction charge, and (2) Javier failed to produce evidence at trial to support the false alibi that formed the basis for the obstruction charge. For the reasons we now explain, we disagree with Javier that the prosecutor's remarks impermissibly shifted the burden of proof.

¶42    As to the obstruction charge, it appears true that, to prove the elements of that charge (and also to prove the elements of the bail jumping charge predicated on the obstruction charge), the State had the burden to prove that the allegedly false alibi forming the basis for the obstruction charge was in fact false. Even so, we conclude that the prosecutor's remarks regarding this alibi—in which Javier claimed to have been with his mother in Freeport—were not burden shifting. The prosecutor told the jury as follows:

> Then we have false alibi two .... You know[,] I was in—with my mother in Freeport. Why not put that in the record? State has the burden of proof, but they have the ability, obviously, to produce records if in fact his mother was in Freeport. The fact that they didn't, I think that tells you all we need to know about this whole claim of being with his mother in Freeport, which he claimed two days later.

13

In these remarks, the prosecutor was not telling the jury that Javier had the burden to prove that his alibi was true. Rather, the prosecutor was making a different and more specific point that if Javier was with his mother in Freeport when he said he was, it would be reasonable to expect the defense to produce evidence ("records") of his mother's location at the time. This was not burden shifting. *See **State v. Patino***, 177 Wis. 2d 348, 379, 502 N.W.2d 601 (Ct. App. 1993) ("A prosecutor's … questioning or argument about the shortcomings of the defense evidence does not, *per se*, constitute a shifting of the burden of proof.").

¶43 As to other charges that were not predicated on Javier having provided a false alibi to police, Javier does not persuade us that there is any basis to conclude that the State had the burden to prove the falsity of his alibis in order to prove the elements of those charges. Although the alibis, if true, might have provided a defense to one or more of the charges, Javier cites no authority for the proposition that the State has the burden to disprove an alibi defense. Accordingly, Javier does not persuade us that the prosecutor engaged in burden shifting as to these other charges.

## *Conclusion*

¶44 For all of the reasons stated above, we affirm the judgments of conviction and the order denying postconviction relief.

*By the Court*.—Judgments and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.